**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

**BANTA CORPORATION,**

                               **Plaintiff,**

v.

**GRAPHIC COMMUNICATIONS
INTERNATIONAL UNION UPPER
MIDWEST LOCAL 1-M, GEORGE
OSGOOD, ROBERT DEAN STANTON,
ROBERT L. MESSERSMITH, CHUCK
LONG, HELEN WAINWRIGHT, and
DAVID RADZIEJ,**

                               **Defendants.**

**MEMORANDUM OF LAW AND ORDER**

Civil No. 04-1022 (MJD/SRN)

Bernard J. Bobber, Foley & Lardner L.L.P., and Bruce C. Recher, Henson & Effron, Counsel for Plaintiff.

Ruth S. Marcott, Felhaber, Larson, Fenlon, & Vogt, P.A., Counsel for Defendants.

**I.    INTRODUCTION**

This matter came on before the Court on Cross-Motions for Summary Judgment on November 22, 2005.  Defendants' Motion for Summary Judgment asks that Plaintiff be made to pay alleged delinquent contributions to a health and pension fund pursuant to ERISA Section 515.  Defendants also seek liquidated damages, interest, and attorney's fees.  Plaintiff's Motion for Summary Judgment requests a declaration that it is not liable for these contributions and that Defendants' counterclaims be dismissed with prejudice.

## II.     FACTUAL BACKGROUND

Plaintiff Banta Corporation ("Banta") initially brought this action to obtain a declaratory order that it is not liable for certain contributions to a multi-employer health and welfare benefits plan.  Defendant Graphic Communications International Union Upper Midwest Local 1-M Health and Welfare Fund ("Fund") and its Trustees counterclaimed seeking recovery of alleged delinquent contributions from Banta.  The facts of this case are complicated.  The parties dispute which of five contracts govern Banta's obligations to the Fund, namely the (1) the 1988 Adoption Agreement, (2) the Rules and Regulations of the Trust, (3) the Trust Agreement, (4) the 1995 Participation Agreement, and (5) the 1999 Collective Bargaining Agreement.

The alleged delinquent contributions fall into two categories: (1) contributions owed to pay for certain benefits afforded to laid-off employees for an additional six months of coverage ("double six-month coverage"); and (2) contributions to fund Banta's retiree benefits assessed at the time of Banta's withdrawal from the Fund ("withdrawal liability").

Banta is a Wisconsin corporation in the business of, among other things, providing commercial printing and supply-chain management services.  Banta's predecessor company was McGill-Jensen Inc. ("McGill").  Banta and its predecessor McGill have been contributing to the Fund since prior to 1988 until sometime in 2004.

2

The Fund is a multi-employer welfare benefit plan which provides group life insurance, disability, dental and medical benefits to members of the Graphic Communications International Union Local 1-M ("Union"). Participating employers pay for the benefits distributed by the Fund. The Fund is jointly administered pursuant to Section 302(c)(5) of the Labor Management Relations Act. The Fund is operated by a Board of Trustees ("Trustees") consisting of an equal number of Union-appointed Trustees and employer-appointed Trustees.

In 1987, the Trustees sought to establish appropriate reserve levels in order to provide laid-off worker benefits and retiree benefits while assuring the Fund's continued financial soundness. The Trustees determined that the Fund would have to assess significant contribution increases from the contributing employers. As a solution to prevent overburdening the employers, the Trustees proposed adopting Rules and Regulations relating to laid off and retired employees that would avoid assessing a large increase in employer contributions. The Trustees developed a plan that would shift the costs to the employers, but allow the employers to pay at a later time. These changes would be reflected in the updated Rules and Regulations.

The proposed Rules and Regulations provided that the employer would make contributions on behalf of the laid-off employee when and if any layoff actually occurred. This shifted the funding obligation from the Fund to the employer. As to retired employees, rather than requiring immediate

contributions, the Trustees proposed calculating a monthly contribution necessary to sustain up to five years of retiree benefits.

The proposed Rules and Regulations also addressed withdrawal from the fund. If a contributing employer withdrew from the Fund, that employer would have to pay its share by providing the cost of coverage as it existed at the time of withdrawal. The Fund developed a method of calculating the remaining amount the withdrawing employer would have to contribute.

McGill signed the Adoption Agreement agreeing to be bound to the new Rules and Regulations pertaining to employer contributions for laid-off and retired employees on April 4, 1988 ("1988 Adoption Agreement"). The 1988 Adoption Agreement states:

> [McGill] hereby adopts and agrees to be bound by the Rules and Regulations of the Trustees of the Fund pertaining to employer contributions for laid off, sick, disabled and retired employees, which Rules and Regulations are attached hereto and incorporated herein by reference as Exhibit A to this Adoption Agreement.
>
> To the extent that the adoption of such Rules and Regulations conflict with the existing labor agreement entered into between the undersigned employer and the Graphic Communications International Union Upper Midwest Local 1-M (the "Union"), the undersigned employer and Union agree that the Rules and Regulations shall take precedence and the existing collective bargaining agreement shall be deemed modified to the extent required to be consistent with the Rules and Regulations.

The 1988 Adoption Agreement was a standard form that all contributing employers had to sign in order to participate under the new Rules and Regulations. If the employer did not sign the 1988 Adoption Agreement, that

4

employer would be subject to higher monthly contribution rates.  Eventually, all employers signed the 1988 Adoption Agreement.

Under the new Rules and Regulations, laid-off employees were entitled to six months of coverage in the plan year in which the layoff occurred.  If the employee paid for the balance of that plan year, an additional six months of coverage would be provided in the next plan year (April 1 to March 31).  The Rules and Regulations also defined when an employer would be deemed withdrawn from the fund.  In the event of an employer withdrawal, that employer would be subject to withdrawal liability pertaining to its retired employees.

In 1994, the Trustees reaffirmed their Trust Agreement with Banta.  The relevant provisions of the Trust Agreement are set forth below.  Section 1.5 of the Trust Agreement states:

> Employers as described in this Section shall, by the making of payments to the Trust Fund pursuant to such collective bargaining or other written agreements, be deemed to have accepted and be bound by this Trust Agreement.

Section 5.6 states:

> The Plan Administrator is a fiduciary . . . . As such fiduciary, the Plan Administrator is hereby granted discretionary authority to determine the eligibility or non-eligibility for benefits and to construe the term of any plan of benefits established by the Trustees herein, provided that such construction is in accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with Title I of ERISA.

Section 8.1 states:

> The Trustees shall establish the plan or plans of benefits to be provided by this Fund.  Having done so, the Trustees shall establish the necessary contribution level that will support the plan of benefits being provided by this Fund.  Such contribution level or levels may be changed from time to time by action of the Trustees.  In order for benefits to be provided, each Employer shall pay to the Trustees or through such banks as the Trustees may designate contributions at the level required by the Trustee on behalf of each participant who is to receive benefits under this Fund . . .
>
> The Trustees shall have full authority to determine all questions of the nature, amount and duration of benefits to be provided based upon the contributions received and to be received, the reserves established in the Fund and the other assets of the Fund in such manner as to prevent undue depletion of the Fund or excessive accumulation of assets in the Fund.

Under Section 10.1 the Trust Agreement can be amended as follows:

> This Agreement and Declaration of Trust may be amended in writing at any time by unanimous actions of PIM and the Union.  Provided, however, that no amendment shall be adopted which:
>
> . . .
>
> (e) Changes the amount of contributions required to be made by the Employers; the amount of said contributions being governed by the later of the applicable collective bargaining agreements executed between the Union and the Employer or by Participation Agreements signed between the Trust and the Employer.

Last, Section 12.7 of the Trust Agreement provides as to its construction:

> This Trust shall be construed and enforced according to the laws of Minnesota, except as otherwise provided by ERISA.

Since 1988, Banta entered into several collective bargaining agreements with the Union. The most recent collective bargaining agreement between Banta and the Union was entered into on May 7, 1999 (" 1999 CBA").  The 1999 CBA

6

also addresses the issue of employer contributions for health and welfare benefits.

Article 23, Section 1 of the 1999 CBA provides:

> Effective May 7, 1999 the Employer agrees to contribute to a joint health and welfare fund for each employee covered by this contract the sum of $572.00 per month to maintain benefits as determined by the trustees. In addition, through April 30, 2003, the Employer agrees to increase or decrease contributions upon approval and recommendation by a majority of the full Board of Trustees.

Article 23, Section 2(c), addresses coverage for laid-off employees:

> Laid off employees will be provided with identical coverage for six (6) months of unemployment in each contract year. The Employer of record pursuant to the rules and regulations of the Fund shall pay for the premiums of such coverage.

Section 5 of Article 23 states:

> It is further understood that the total liability of the Employer under the Health and Welfare Plan referred to in this Article are the amounts stated in Article 23, Section 1.

Article 37 of the 1999 CBA states:

> This Contract sets forth the entire understanding and agreement of the parties and may not be modified in any respect except by writing subscribed to by the parties. Nothing in this Contract shall be construed as requiring either party hereto to do or refrain from doing anything not explicitly and expressly set forth in this Contract.

In December 1994, the Trustees approved a motion to allow certain Banta employees who were not represented by the Union to be added as beneficiaries to the Fund. Banta signed a Participation Agreement on January 1, 1995 which explicitly re-acknowledged the Fund's Rules and Regulations. The participation agreement states in relevant part:

7

> The employer agrees to be bound by, and hereby assents to, all of the terms of the Trust Agreement creating said Fund, as amended, all of the rules and regulations heretofore and hereafter adopted by the Trustees of said Fund pursuant to said Trust Agreement, and all of the actions of the Trustees in administering such Fund in accordance with the Trust Agreement and rules adopted, provided such rules, regulations or actions are not inconsistent with this Participation Agreement.

In 2000, the Trustees amended the withdrawal liability rules. The amended rules state:

> The withdrawal liability payment or payment due from a contributing employer pursuant to these Rules are contractual contributions required under the collective bargaining agreement. If not paid on the date specified in subparagraph (1) or (b), they shall be deemed to be delinquent pursuant to ERISA § 515 and shall be subject to the delinquency collection procedures provided by the Fund including penalties, liquidated damages, interest and attorney's fees all as provided by ERISA § 502(g).

In the summer of 2003, Banta decided to close its McGill plant in Saint Paul, Minnesota. Approximately 300 positions were eliminated. The McGill plant was essentially shut down as of October 1, 2003. The 1999 CBA was due to expire in April 2003, so the parties extended the CBA to December 31, 2003, under the Plant Closing Agreement.

The Trustee determined that Banta had withdrawn from the Fund and sent a letter to Banta on December 16, 2003. The letter apprised Banta that it had withdrawn effective July 31, 2003. Initially, the Fund estimated Banta's withdrawal liability at $1.035 million.

In a letter to Banta dated December 29, 2003, a Fund Trustee wrote:

8

> It has come to my attention that former employees of Banta Catalog St. Paul may qualify for extended health coverage in 2004 under the terms and conditions of the Trust Agreement governing the Upper Midwest Local 1-M Health and Welfare fund. We should discuss this situation at your earliest convenience.

The Trustees modified the withdrawal rules again on January 18, 2004. The new withdrawal rules were made effective retroactively for January 1, 2003. Banta was the only employer affected by the retroactive plan. Under the new withdrawal rules, an employer is deemed to have withdrawn when the employer permanently ceases to have an obligation to contribute to the Fund or permanently ceases "virtually all operations at the facility for which the Employer makes contributions to the Fund," whichever occurs earlier.

The Trustees revised Banta's withdrawal liability and sent another letter to Banta on January 27, 2004. The letter stated that Banta withdrew from the Fund on December 31, 2003. The amount of Banta's withdrawal liability was re-assessed at $1,169,519.00.

Banta contends that its obligation to make contributions to the Fund, and the extent of that obligation, are governed by the language of the CBA, not the 1988 Adoption Agreement or Trust Agreement. Furthermore, Banta argues that the CBA does not obligate Banta to contribute a withdrawal liability or double six-month coverage. Conversely, the Fund contends that Banta directly agreed to be obligated by the Rules and Regulations.

9

## III.   DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Id. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion."  Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.   Contract Interpretation

The question of whether or not any contract, including a collective bargaining agreement, is ambiguous is a question of law.  Cent. States Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co., 919 F.2d 1343, 1350 (8th Cir. 1990).  A contract is ambiguous only if it is reasonably susceptible to more than one construction.  Id.  In ascertaining whether a contract is reasonably susceptible to more than one construction, words are given their plain and ordinary meaning as understood by a reasonable average person.  Id.

## C. ERISA Section 515

Contributions to multi-employer benefit funds are governed by ERISA Section 515, which provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan <u>or</u> under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145 (emphasis added).

## D. Whether the Terms of the Trust Documents or the CBA Govern Banta's Employer Contribution Obligations

Multi-employer plans can be construed either in accordance with the terms in the trust documents or the collective bargaining agreement. Section 515 does not address how to resolve a conflict between the terms of a multi-employer plan and a CBA. <u>N.Y. State Teamsters Conf. Pension & Ret. Fund v. United Parcel Service</u>, 382 F.3d 272, 279 (2d Cir. 2004). Interpretation of the parties' agreements requires an initial determination as to which contracts control.

There are three primary contracts that address Banta's employer contribution obligations: the Trust Agreement itself, the 1988 Adoption Agreement that obligated Banta to the Rules and Regulations "Pertaining to Employer Contributions for Laid Off, Disabled and Retired Employees," and the 1999 CBA, which states that Banta agrees to make contributions to "a joint health and welfare fund." Before the Court can analyze whether Banta owes a

11

withdrawal liability or double six-month coverage, the Court must first determine the extent and scope of Banta's employer contribution obligations under the three agreements.

The Fund argues that the provisions of the Trust Agreement provide the proper framework for analyzing Banta's obligation to the fund. The Fund cites two cases for this proposition: N.Y. State Teamsters Conf. Pension & Ret. Fund v. United Parcel Service, Inc., 382 F.3d 272 (2d Cir. 2004) and Cent. Pa. Teamsters Pension Fund v. W&L Sales, Inc., 778 F. Supp 820, 829 (E.D. Pa. 1991).

In W&L Sales, the district court noted that the provisions of a trust agreement provide the framework with which a court should analyze an employer's obligation to contribute to a health and welfare fund. 778 F. Supp at 829. The district court found that the defendant employer agreed to be bound by the trust provisions because the defendant agreed to "make prompt contributions or payments to the Fund in such amounts pursuant to the terms and conditions set forth in the . . . Rules and Regulations of the Trustees." Id. Similar to the Fund's Trust Agreement, the trust agreement in W&L Sales underscored the power of the trustees to operate the trust and to adopt rules and regulations. The district court found that there was no provision in the trust agreement showing an "intent that the provisions of a collective bargaining agreement shall prevail over the terms of the Trust." This district relied on W&L Sales in a somewhat similar case involving the Fund. See Trustees of the Graphic Communications

International Union Local 1B Health and Welfare Fund v. Tension Envelope Corp., Civil No. 02-1818, 2003 WL 1572140, at *5-6 (D. Minn. Mar. 24, 2003) (unpublished) (holding that summary judgment was appropriate because there was "no expression of an intent that the provisions of the CBA shall prevail over the terms of the Trust").

In N.Y. State Teamsters, the Second Circuit affirmed the district court's finding that an implied eight-hour-a-day contribution cap, which was an unwritten but understood provision of the CBA, could not supercede the rules and regulations of the applicable participation agreement. See 382 F.3d at 279-80. The Second Circuit noted that other circuits have unanimously regarded Section 515 as a limitation on the defenses available to an employer when sued by an employee benefit plan. Id. at 280. Employers are repeatedly barred from invoking as a defense unwritten agreements with the union not to enforce terms of the CBA with respect to multi-employer plan contributions. Id. Persuaded by this reasoning, the Second Circuit held that "otherwise valid collection regulations promulgated by a multi-employer plan to effectuate contributions cannot be defeated by implied or unwritten agreements between employers and unions. Id.

The Second Circuit, however, did not reach the broader holding on which the district court relied: that a participation agreement supercedes and controls all terms of a CBA, written or unwritten. Id. at 281. The Court noted that the rulemaking authority of a multi-employer plan is limited by the terms of the plan's

13

creation documents.  Id. (citation omitted).  The documents that created the N.Y. State Teamsters fund did not give the trustees the power to use their rules and regulations to supercede the written terms of CBAs.  Id.

In this case, it initially appears that the Trust Agreement and the 1988 Adoption Agreement grants the Fund the authority to supercede the general provision of the existing CBA.  Sections 8.1(a) and (c) of the Trust Agreement, reference the authority and power of the trustees to set "contribution levels" and to "collect contributions."  The 1988 Adoption Agreement states that:

> The undersigned employer . . . hereby adopts and agrees to be bound by the Rules and Regulations of the Trustees of the Fund pertaining to employer contributions for laid off, sick, disabled and retired employees . . .
>
> To the extent that the adoption of such Rules and Regulations conflict with the existing labor agreement . . . the undersigned employer and Union agree that the Rules and Regulations shall take precedence and the existing collective bargaining agreement shall be deemed modified to the extent required to be consistent with the Rules and Regulations.

(Ex. 7)  (emphasis added.)

Banta does not dispute that it was bound by the Rules and Regulations when it signed the 1988 Adoption Agreement.  Banta just argues that its obligation under the 1988 Adoption Agreement ended in 1999 with the signing of the 1999 CBA and that the 1988 Adoption Agreement only modified the "existing" CBA.  Therefore, Banta submits that the 1988 Adoption Agreement only continued to be effective for the remainder of the term of its then-existing CBA

14

and that the Fund's Rules and Regulations only take precedence over the CBA that existed in 1988.

The debatable question is whether "existing CBA" means the "then-existing CBA" or "the applicable CBA." The definition of "exist" is "to have real being" or "to continue to be" or "to have being in a specified place or with respect to understood limitations or conditions." Merriam-Webster's Collegiate Dictionary 407 (10th ed. 1999). According to the above definition, the "existing CBA" could include the 1999 CBA. However, the plain meaning of "existing" appears to mean in existence now, current, or present-day.

The Trustees adopted model language for other CBAs where other employers expressly recommitted to be bound by the Rules and Regulations. Unlike the Fund's other participating employers, Banta's 1999 CBA does not expressly say that Banta agrees to be bound by the Rules and Regulations of the Fund. The Fund argues that the model CBA language is a red herring that Banta relies upon to avoid responsibility for its contracts establishing its liability for contributions. The Fund notes that language similar to that in the model CBAs is included in the 1988 Adoption Agreement and the 1995 Participation Agreement. However, this fact does not conclusively demonstrate for the purposes of summary judgment that the Fund should prevail. The 1988 Adoption Agreement arguably applied to then-existing CBAs only, and the 1995 Participation

15

Agreement only applied to Banta's non-union employees and was signed before the 1999 CBA.

Banta maintains that Section 10.1(e) of the Trust Agreement confirms that employer contributions are governed by subsequent CBAs. Banta points to the following language:

> Section 10.1- This Agreement and Declaration of Trust may be amended in writing at any time by unanimous action of PIM and the Union. Provided, however, that no amendment shall be adopted which:
>
> . . .
>
> (e) Changes the amount of contributions required to be made by the Employers; <u>the amount of said contributions being governed by the later of the applicable collective bargaining agreements executed between the Union and the Employer</u> or by Participation Agreements signed between the Trust and the Employer.

(emphasis added). Banta maintains that the 1999 CBA is the "later" agreement and governs contribution types and levels.

The cases that the Fund relies upon for support are not entirely helpful in this case. Under <u>N.Y. State Teamsters</u>, the rulemaking authority of a multi-employer plan is limited by the terms of the plan's creation documents. In this case, the 1988 Adoption Agreement is arguably limited to be read alongside only the "existing" CBA at the time of signing. For this reason, it would also appear that the analysis in <u>W&L Sales</u> does not apply because it is arguable that there <u>is</u> an intent that the provisions of <u>subsequent</u> CBAs should prevail over the terms of the Trust. <u>W&L Sales</u> applies when the Trust Agreement shows "no intent that

16

the collective bargaining agreement shall prevail over the terms of the Trust." 778 F. Supp at 829.  If the 1988 Adoption Agreement simply read, "the CBA" instead of "existing CBA," then W&L Sales would be a more helpful guide.

The Fund argues that the 1988 Adoption Agreement should take precedence over the 1999 CBA because it is the more specific agreement regarding Banta's obligation to the Fund.  The 1988 Adoption Agreement expressly committed Banta to make contributions as the Trustees deemed appropriate.  But when utilizing the plain meaning of "existing," it remains unclear whether the 1999 CBA effectively negated Banta's express agreements agreeing to be bound by the Rules and Regulations.  The 1999 CBA does not expressly re-adopt the Rules and Regulations nor does it expressly modify Banta's obligations to the Fund.  Because the order of priorities between these two contracts is ambiguous, the issue of which document takes precedence raises a factual issue that should be left for the jury.

> **E. Whether the Fund Can Seek Contributions for Withdrawal Liability Double Six-Month Coverage**

Whether the Fund can assess withdrawal liability or double six-month benefit contributions is a distinct issue of interpretation.  The Fund maintains that the Trust Agreement gives the Fund the full authority to any employer contribution it seeks.  Banta argues that the 1999 CBA does not obligate Banta to pay withdrawal liability or double six-month coverage and expressly disavows any

17

liability to the Fund beyond what is stated in the 1999 CBA.  However, the Court cannot address this issue until a determination is made on whether the 1999 CBA or other Trust documents control.

### F. Conclusion

The Court denies both parties' motions for summary judgment.  Under ERISA Section 515, employer obligations to a multi-employer plan must be determined in accordance with the terms of the plan or the terms of a CBA.  Despite the Fund's authority to establish contribution types and levels, the Court must determine what kind of effect, if any, the subsequent 1999 CBA has on the Trust Agreement.  It is unclear which document controls and the facts, as presented, do not lead to one clear conclusion.  A reasonable person could place more weight on the plain meaning of "existing" and thus preclude the Fund's position that the terms are to be construed by the Rules and Regulations.  On the other hand, a reasonable person could determine that the Trust Agreement granted the Trustees "full authority" to decipher contractual conflicts and set contribution levels.  Because a reasonable person could come to different conclusions on this threshold issue, neither party is entitled to summary judgment.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Defendants' Motion for Summary Judgment [Docket No. 15] is **DENIED**.

2. Plaintiff's Motion for Summary Judgment [Docket No. 22] is **DENIED**.

Dated: January 6, 2006                    s/ Michael J. Davis
                                          Judge Michael J. Davis
                                          United States District Court